In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3007

Gary McKnight,

Plaintiff-Appellant,

v.

Kenneth A. Dean, et al.,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 C 8939--Paul E. Plunkett, Judge.

Argued April 9, 2001--Decided November 2, 2001

Before Posner, Evans, and Williams, Circuit
Judges.

Posner, Circuit Judge.  In this
extraordinary case an individual who
obtained a $765,000 settlement in a suit
for legal malpractice is suing--for legal
malpractice--the lawyers who obtained the
settlement for him. It is a tangled
story, and we must begin at the
beginning.

In 1987 Gary McKnight brought suit
against his former employer, General
Motors, in a federal district court in
Wisconsin, charging discrimination in
violation of 42 U.S.C. sec. 1981 and
Title VII of the Civil Rights Act of
1964. He obtained a verdict of $110,000
in compensatory damages (of which half
represented back pay) and $500,000 in
punitive damages; the district judge
refused, however, to order him
reinstated. The parties cross-appealed.
Back pay and reinstatement were the only
relief sought by McKnight under Title
VII; and while the appeals were pending,
the Supreme Court held in Patterson v.
McLean Credit Union, 491 U.S. 164, 176-78
(1989), that section 1981 does not reach
discrimination by a private employer
against existing employees. (Congress
amended the statute to change this rule,
Hardin v. S.C. Johnson & Son, Inc., 167
F.3d 340, 346 (7th Cir. 1999), but that

has no bearing on this case.) General Motors had failed to argue the ground that the Court adopted in Patterson, even though the Patterson case was pending in the Supreme Court during the trial of McKnight's case. We thought this might be a waiver, but did not decide, for "if by this delay General Motors waived its right to invoke Patterson, a question we need not answer, McKnight cannot benefit. For . . . he has never argued that General Motors has waived its right to rely on Patterson. A defense of waiver is itself waivable. McKnight waived any defense of waiver that he might have had." McKnight v. General Motors Corp., 908 F.2d 104, 108 (7th Cir. 1990). We concluded that Patterson had knocked out McKnight's claims under section 1981, so that the award of compensatory damages beyond back pay (which was $55,000), plus the award of punitive damages ($500,000), had to be reversed. Id. at 112. We upheld the award of back pay, however, under Title VII; and though we suspected that McKnight was seeking reinstatement merely in order to extract compensation from GM--"after being fired by GM McKnight entered the financial services industry [as a stockbroker] where after a few years he was earning more money than he did earn or would have been earning at GM," id. at 116--we held that the district judge's denial of reinstatement could not stand. For it had been based in part on the judge's belief that the award of punitive damages had fully compensatedMcKnight for the loss of his employment with GM--and we were vacating that award.

In remanding we noted that "should the judge again decide not to order reinstatement, a remedial gap will open up," for if "reinstatement is withheld because of friction that would ensue independently of any hostility or retaliation by the employer, a remedy limited to back pay will not make the plaintiff whole." Id. We therefore left open for consideration on remand whether in such a case an award of "front pay" (lost future earnings) was authorized by Title VII and, if so, whether this was an appropriate case for such an award. Id. at 117.

On remand, the district court again denied reinstatement. After refusing to reopen the record to receive additional

evidence on the issue, the judge said that the damages award in the previous round had not figured importantly in his decision to deny reinstatement. What had been important was that McKnight's relationship with GM was acrimonious and that he did not want reinstatement to his previous job as a manufacturing supervisor but instead wanted GM to give him a position managing GM's corporate finances, a position for which he did not appear to be qualified. The judge also denied the alternative of front pay, because McKnight wanted GM in effect to insure him against the vicissitudes consequent upon his own choice to switch from manufacturing to financial services. Anyway he had failed to submit the data required to enable a calculation of the amount of front pay. Indeed, he had failed to brief the issues of reinstatement and front pay. Finally, the judge denied as untimely McKnight's request for prejudgment interest on the $55,000 award of back pay.

We affirmed. The result was that GM owed McKnight only the $55,000 in back pay, plus postjudgment interest of some $11,000 on that amount, plus a stipulated amount of attorney's fees (some $57,000) which GM deposited in court. A dispute then arose between McKnight and Robert Gingras, the lawyer who had handled the case in the district court, concerning Gingras's share of these fees. This dispute led Gingras to sue McKnight in a Wisconsin state court. One of McKnight's defenses in that suit was that Gingras had committed malpractice in representing him in his suit against GM. McKnight's new lawyer, Kenneth Dean, the principal defendant in the present case (we can ignore the other defendants), filed on McKnight's behalf a diversity suit against Gingras in federal court, charging Gingras with malpractice and thus essentially duplicating the defense that McKnight had raised in Gingras's suit, and he then dropped the defense from that suit. Dean preferred to litigate McKnight's case in federal court because Gingras's law firm practices extensively in the Wisconsin court in which Gingras had sued McKnight. And, sure enough, Gingras obtained a judgment against McKnight in that suit--and then pleaded it as res judicata in the federal malpractice suit that McKnight, represented by Dean, had brought against

him. The district judge held that the plea was good as to any claim pertaining to Gingras's handling of the trial of the discrimination suit (but not the appeal or remand), and thus wiped out any complaint about Gingras's failure at the trial to present evidence in support of reinstatement or front pay, or to calculate back pay correctly. The malpractice defense, the judge ruled, had been a compulsory counterclaim to Gingras's suit for attorneys' fees, and a compulsory counterclaim that is not pleaded (or that is abandoned) is forfeited. Fed. R. Civ. P. 13(a); Southern Construction Co. v. Pickard, 371 U.S. 57, 60 (1962) (per curiam); Burlington Northern R.R. v. Strong, 907 F.2d 707, 710 (7th Cir. 1990). (This ruling was error, as we'll see.) That left the "waiver of waiver" on the first appeal and also Gingras's failure on remand to brief reinstatement and front pay as grounds for McKnight's malpractice suit against Gingras.

Now it happened that Gingras had malpractice insurance with a cap of $1 million to cover both liability and attorneys' fees, and the insurance company had expended $235,000 on the defense of McKnight's malpractice suit against him. The company offered to settle the case for the difference between that amount and the $1 million cap, that is, for $765,000 ($475,000 after Dean deducted his fee). Dean is alleged by McKnight (we must assume truthfully, in the present posture of the case) to have told him that this was the most he could expect to obtain, and so he "must" settle for it--concealing from him the fact that any judgment against Gingras could be satisfied out of Gingras's personal assets as well as out of the proceeds of the insurance policy. So McKnight settled, thus setting the stage for this malpractice suit against Dean and his associates. McKnight claims that Dean committed malpractice in dropping the malpractice defense in the suit that Gingras had brought in the Wisconsin state court and in forcing him to settle for $765,000 rather than holding out for a larger settlement and if necessary proceeding to trial. The district court granted summary judgment for the defendants on the ground that McKnight had failed to show that the alleged malpractice had actually hurt

him.

The reasonableness of Dean's representation of McKnight is related to the gravity of the malpractice claim against Gingras, the claim that Dean was hired to press, and so let us begin with the case against Gingras. His unexplained delay in seeking prejudgment interest to which McKnight undoubtedly was entitled on the award of back pay, Loeffler v. Frank, 486 U.S. 549, 557-58 (1988); Herrmann v. Cencom Cable Associates, Inc., 999 F.2d 223, 225 (7th Cir. 1993); Booker v. Taylor Milk Co., 64 F.3d 860, 868-69 (3d Cir. 1995), was negligent, but no effort has been made to estimate the amount of such interest to which McKnight would have been entitled.

Gingras could hardly be faulted for having failed to put in more evidence in support of a claim for reinstatement or alternatively for front pay, whether at the trial or on remand, because there was very little evidence that he could have put in. McKnight wanted to switch from manufacturing to financial services, and the ups and downs of his income that ensued were due to that choice rather than to his being discharged by GM, which did not have a job in financial services that matched his qualifications. Besides, as noted in our previous opinion, McKnight v. General Motors Corp., supra, 908 F.2d at 116-17, we hadn't yet held that front pay was an available remedy in a Title VII suit, as we since have held, Williams v. Pharmacia, Inc., 137 F.3d 944, 951-53 (7th Cir. 1998), and as the Supreme Court held in Pollard v. E.I. du Pont de Nemours & Co., 121 S. Ct. 1946 (2001). Because these holdings were not at all unexpected, see, e.g., Anderson v. Group Hospitalization, Inc., 820 F.2d 465, 473 (D.C. Cir. 1987); James v. Stockham Valves & Fittings Co., 559 F.2d 310, 358 (5th Cir. 1977); Larry M. Parsons, Note, "Title VII Remedies: Reinstatement and the Innocent Incumbent Employee," 42 Vand. L. Rev. 1441, 1456-57 (1989), Gingras's failure to seek front pay merely because the law was unsettled might well have been negligent; but as we've said, all that matters is that in the circumstances of this case he could not have made a persuasive case for awarding McKnight front pay. As for his failure to argue "waiver of waiver" in this court in 1990, though it was by then

an established doctrine in this court, see Garlington v. O'Leary, 879 F.2d 277, 282 (7th Cir. 1989); United States v. Moya-Gomez, 860 F.2d 706, 745-46 n. 33 (7th Cir. 1988); Lynk v. LaPorte Superior Court No. 2, 789 F.2d 554, 565 (7th Cir. 1986), we never held that GM had waived its defense based on the Patterson case by asserting it as late as it did, only that it might have waived it. Nor was it clear that GM even had such a defense in McKnight's case; it took us several pages of dense analysis in our 1990 opinion to conclude that it did. Legal malpractice is not a failure to be brilliant, but a failure to come up to even a minimum standard of professional competence. E.g., Praxair, Inc. v. Hinshaw & Culbertson, 235 F.3d 1028, 1031 (7th Cir. 2000). It is not a synonym for undistinguished representation. Id.

For Dean to have extracted a settlement of $765,000 from Gingras was impressive given the weaknesses in the case against Gingras, especially when we consider that the failure to argue waiver of waiver cost McKnight at most $555,000 (the damages that we held barred by GM's Patterson defense). Had McKnight not settled for $765,000, the insurance company's offer would have shrunk as the company continued spending money on Gingras's defense; and Gingras, rather than throwing some of his own money into the settlement pot, might have decided to fight the case--and might have won, or at least lost less than $765,000.

Dean may have been negligent in dropping the malpractice defense to Gingras's state court suit, though even this is unclear. He had tactical reasons, which it is not the office of malpractice litigation to second guess unless unreasonable, Crosby v. Jones, 705 So. 2d 1356, 1358 (Fla. 1998); Wagenmann v. Adams, 829 F.2d 196, 220 (1st Cir. 1987); Woodruff v. Tomlin, 616 F.2d 924, 930, 933 (6th Cir. 1980); cf. Bond v. United States, 1 F.3d 631, 638 (7th Cir. 1993), for preferring to be in federal court; McKnight's argument that it is malpractice per se to give up a possibly meritorious claim in order to obtain a tactical advantage is frivolous. Woodruff v. Tomlin, supra, 616 F.2d at 933; Lipscomb v. Krause, 151 Cal. Rptr. 465, 467-68 (Cal. App. 1978); cf. Entertainment Research Group, Inc. v.

Genesis Creative Group, Inc., 122 F.3d 1211, 1229 (9th Cir. 1997).

One might think, however--the district judge thought--that since the defense was a compulsory counterclaim, there was no way to shift it to the federal court; dropping it in the state court meant forfeiting it in all courts. (Yet despite this Dean negotiated a settlement that generously valued Gingras's alleged malpractice, even though McKnight could no longer litigate it!) Not so. Federal courts are required to give the same effect to a state court judgment that the state that rendered the judgment would give it. 28 U.S.C. sec. 1738; Kremer v. Chemical Construction Corp., 456 U.S. 461 (1982). The preclusive effect of the Wisconsin judgment for Gingras in McKnight's federal suit against Gingras therefore depended on Wisconsin's law of compulsory counterclaims, not the federal rule. Migra v. Warren City School District Board of Education, 465 U.S. 75, 81, 87 (1984); County of Cook v. MidCon Corp., 773 F.2d 892, 898 (7th Cir. 1985). Wisconsin defines compulsory counterclaims very narrowly; failure to plead a counterclaim bars suit only if "the relationship between the counterclaim and the plaintiff's claim is such that successful prosecution of the second action would nullify the initial judgment or would impair rights established in the initial action." A.B.C.G. Enterprises, Inc. v. First Bank Southeast, N.A., 515 N.W.2d 904, 908 (Wis. 1994); Remer v. Burlington Area School District, 205 F.3d 990, 1000 (7th Cir. 2000) (applying Wisconsin law). That test was not satisfied here, because Gingras's claim for fees could have survived a finding that he was guilty of malpractice if the value of his services exceeded the loss that his malpractice imposed. See Moores v. Greenberg, 834 F.2d 1105, 1110-11 (1st Cir. 1987); Schultheis v. Franke, 658 N.E.2d 932, 941 (Ind. App. 1995).

We do not condone Dean's action in "forcing" McKnight to settle. If McKnight was pigheaded and wanted to tilt at windmills, that was his right. Dean didn't have to continue representing him in those circumstances, but he could not, whether to safeguard his fee or for any other reason, use deception to induce his client to settle against the client's

will. The decision to settle is the client's alone. Evans v. Jeff D., 475 U.S. 717, 728 n. 14 (1986); Clarion Corp. v. American Home Products Corp., 494 F.2d 860, 864 (7th Cir. 1974); Thomsen v. Terrace Navigation Corp., 490 F.2d 88 (2d Cir. 1974) (per curiam); In re Disciplinary Proceedings Against Martinez, 591 N.W.2d 866, 868 (Wis. 1999); Brewer v. National R.R. Passenger Corp., 649 N.E.2d 1331, 1333-34 (Ill. 1995). But misconduct of this sort, though a form of malpractice (more precisely, a breach of the lawyer's ethical duty to his client), will often be harmless. Dean did McKnight a favor in "coercing" a $765,000 settlement, if that is what really happened. (Dean denies it, and the district court merely assumed, for argument's sake, that it did happen.) For there is no basis for believing that McKnight would have done better by rejecting the settlement and going to trial; and if there is no injury, there is no tort.

Gingras and his insurance company could not be expected to settle for more than the likely amount of a judgment if the case did not settle, discounted (multiplied) by the probability of a judgment, plus the amount of additional legal expenses likely to be incurred in defending the suit if it went to judgment. Suppose the insurance company believed that McKnight had a 60 percent probability of winning a $1 million judgment if the case was tried, and knew that the defense would cost an additional $165,000 in attorneys' fees. Then the discounted judgment cost (.60 x $ 1 million) plus the additional attorneys' fees would equal $765,000, and that would be the maximum for which the company would settle--and so, given the company's willingness to settle for that amount, McKnight did better than he could be expected to do by insisting on a trial, since that insistence would have an expected value of only $600,000  (.60 $1 million). These are hypothetical figures and the fact that the insurance company settled for the policy limit suggests it may have valued McKnight's claim at more than our figures suggest. But that is merely a conjecture. Insurance companies are not noted for their generosity. Gingras's alleged malpractice had cost McKnight, at worst, $500,000 in punitive damages, $55,000 in

compensatory damages, some prejudgment interest on the back pay award, and either reinstatement or front pay in lieu of it. The prejudgment interest was a small figure (never calculated) and reinstatement, or in lieu thereof an award of front pay, was highly speculative. It is unlikely that a jury would have returned a verdict significantly in excess of the $765,000 for which Gingras's insurance company settled, and the verdict might have been much less given the weaknesses in the malpractice claim against Gingras.

McKnight argues that to repel summary judgment all he had to prove was that Dean's malpractice had caused him some injury, however slight--and that would be true if Dean had obtained no money for McKnight. But Dean obtained $765,000, so that his negligence injured McKnight only if, had it not been for that negligence, McKnight could have expected to obtain more than that amount in his suit against Gingras. Praxair, Inc. v. Hinshaw & Culbertson, supra, 235 F.3d at 1032; Transcraft, Inc. v. Galvin, Stalmack, Kirschner & Clark, 39 F.3d 812, 815 (7th Cir. 1994); Picadilly, Inc. v. Raikos, 582 N.E.2d 338, 344 (Ind. 1991); Glamann v. St. Paul Fire & Marine Ins. Co., 424 N.W.2d 924, 926 (Wis. 1988). That he has failed to show.

Affirmed.