In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-2928

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DESHON T. ADAMS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 16-CR-3 — **William C. Griesbach**, *Chief Judge.*

ARGUED MAY 31, 2017 — DECIDED JANUARY 16, 2018

Before KANNE, SYKES, and HAMILTON, *Circuit Judges.*

SYKES, *Circuit Judge.* Deshon Adams pleaded guilty to unlawfully possessing a firearm as a felon and was sentenced to 87 months in prison—the top of the range recommended by the Sentencing Guidelines. Adams asks us to remand his case for resentencing, arguing that the judge impermissibly considered unreliable evidence linking him to seven unsolved shootings when weighing the sentencing factors under 18 U.S.C. § 3553(a).

We reject this argument and affirm. The challenged evidence consists mainly of summaries of police reports describing some of the physical evidence from the shootings and memorializing statements from witnesses, confidential informants, and jailhouse snitches connecting Adams to the crimes. It also includes several statements by Adams himself, who had bragged to police about his involvement in gang violence, though only in very general terms. The government also introduced testimony from a police detective about the reliability of some, though not all, of the confidential informants.

The judge wisely approached this material with caution and in the end declined to make any explicit findings on the subject. Instead, the judge relied on the government's presentation only very generally, and only to the extent that it confirmed what the presentence report had already documented: Adams is a headstrong young Vice Lords gang member who began committing crimes at age 14 and immersed himself in the gang's subculture of firearms possession and violence. That careful and limited approach raises no due-process concerns and was certainly not an abuse of discretion.

## I. Background

In September 2015 Adams was 20 years old and already a longtime member of the Vice Lords gang in Racine, Wisconsin, with a lengthy record of criminal convictions as a juvenile and adult. On September 25 he was walking down the street with his 15-year-old cousin when a police squad drove by and made a U-turn. As the officers passed by a second time, Adams lifted his shirt and said, "Hey, I got nothin' on me." The officers stopped and detained Adams on

a probation warrant, then retraced his steps to the place where they first spotted him. There, under the wheelchair ramp of a house, they found a 9mm semiautomatic handgun affixed with a high-capacity 30-round magazine. Adams had ditched the gun under the ramp when he first saw the police approach. When questioned about it, Adams indicated that he expected to get a short prison sentence for violating his probation and a concurrent sentence for possessing the gun, which he implied would not be a big deal.

Adams was charged with one count of possessing a firearm as a felon in violation of 18 U.S.C. §§ 922(g) and 924(a)(2). The case was assigned to Judge Griesbach, and Adams eventually pleaded guilty. The presentence report ("PSR") detailed Adams's affiliation with the Vice Lords gang in Racine and his lengthy criminal history as a juvenile and adult, which included (among other crimes) several firearms offenses and a battery. Indeed, and as the PSR documented, before his latest arrest, Adams had been in juvenile or adult custody almost continuously since the age of 14. The PSR calculated an offense level of 21 and a criminal-history category V, yielding a guidelines sentencing range of 70 to 87 months in prison.

At sentencing Judge Griesbach considered and rejected Adams's challenges to the PSR and adopted the probation officer's calculation of the advisory range. He then invited arguments from counsel on the § 3553(a) factors. At this point the government's sentencing memorandum came into play. The prosecutor's written submission pointed to evidence linking Adams to as many as seven unsolved gang-related shootings in Racine, including a murder and an attempted murder. Adams contested the reliability of the

government's submission, especially to the extent that it relied on statements from confidential informants. In light of the dispute, the judge adjourned the hearing and gave the parties an opportunity to supplement the record.

The government submitted a supplemental sentencing memorandum, this time summarizing and quoting more extensively from police reports—including those memorializing Adams's own statements, interviews with victims and witnesses, and physical evidence—and describing in more detail the statements of confidential and jailhouse informants connecting Adams to the unsolved crimes. Most of the shootings stemmed from gang rivalries in Racine.

As relevant here, Adams had been interviewed by police in connection with at least two of the shootings. In one interview he admitted to police that younger Vice Lords members looked up to him as a "shot caller." In the most recent interview, conducted after his arrest for the present offense, he was questioned about two of the shootings, both of which occurred earlier in September 2015. He told the police that he couldn't have been the shooter in either case because too few rounds had been fired. More specifically, an officer mentioned that in one of the shootings, eight rounds had been fired. Adams replied:

> Eight rounds still ain't enough. When you talkin' to me, it's 17 or better. …

> You ain't just talking to anybody man, come on. 17 or better, I'm talking about, and maybe an extra clip to make it look like it was a 30 round the whole time it was two clips. No eight rounds. That ain't never been my type.

When the sentencing hearing reconvened, the government called Detective Klinkhammer of the Racine Police Department, who testified about the reliability of some, though not all, of the confidential informants. After direct and cross-examination of the detective, the judge asked Adams's attorney if he wanted to present any evidence. Counsel said no, he'd rely on argument alone to contest the government's presentation.

The parties then presented their arguments on the § 3553(a) factors, primarily focusing on the reliability of the government's evidence connecting Adams to the seven shootings. The government ultimately recommended a within-guidelines sentence of 84 months consecutive to Adams's state sentence on his probation revocation. Adams's lawyer argued for a below-guidelines sentence of four or five years concurrent with his client's probation revocation.

At the conclusion of these arguments, Judge Griesbach undertook a detailed analysis of the § 3553(a) factors. Addressing the government's contention that Adams was implicated in the seven unsolved shootings, the judge specifically acknowledged the "dangers of relying on confidential informants [and] jailhouse snitches." On the other hand, the judge explained, "much of the evidence here is corroborated"—some "by third parties" and some "by the [d]efendant's own statements." Ultimately, however, the judge declined to make specific findings about whether Adams was involved in any of the shootings. Instead, he considered the government's evidence only insofar as it corroborated a more general proposition about Adams's background that was already substantiated by the PSR.

More particularly, the judge summarized his considera-
tion of the government's submission as follows:

> Yes, I recognize that there's certainly a risk in
> relying on [the confidential informants]. We're
> not here—and actually I don't even think I
> need to put much weight on the confidential
> informants, although I do note that the only
> type of information you get here is often from
> confidential informants. I'm not going to make
> a finding on every one of the incidents the
> [g]overnment has presented.
>
> I am satisfied, though, from that evidence,
> from the corroboration, from the [d]efendant's
> own words, that he is well involved in the vio-
> lent gang culture, including the use of firearms,
> and the threatening of people, and using fire-
> arms against people. So I am satisfied that—
> but that's certainly a factor that I have to con-
> sider as well.

Moving to the remaining sentencing factors, the judge
explained that "there's very little prosocial behavior here. No
real employment of any significance. No educational
achievement of any significance. The [d]efendant has really
gone from supervision, to youth corrections, to probation
and jail, to prison with very little stopping point[] in be-
tween." Accordingly, the judge found that the need for
deterrence "warrants a significant sentence here." Finally,
after touching on other aspects of Adams's background and
the need to protect the public, the judge settled on a sentence
at the top of the guidelines range: 87 months consecutive to
the state probation-revocation sentence.

## II. Discussion

Adams argues that the evidence linking him to the seven uncharged shootings is unreliable and that the judge impermissibly relied on it to arrive at the 87-month sentence. In the alternative, he maintains that he was deprived of an opportunity to rebut the government's evidence.

Our analysis is governed by some basic sentencing principles; all are familiar. First, substantive sentencing review is quite limited. The sentencing judge has substantial discretion to weigh the § 3553(a) factors and arrive at an appropriate sentence; we review the judge's decision only for abuse of discretion. *Gall v. United States*, 552 U.S. 38, 41 (2007). We will set aside a sentence on substantive grounds only if it is unreasonable, *see Rita v. United States*, 551 U.S. 338, 341 (2007), and a sentence within a properly calculated guidelines range is presumptively reasonable, *see United States v. Martinez*, 650 F.3d 667, 671 (7th Cir. 2011). Finally, a defendant has a due-process right to be sentenced only on the basis of reliable information. *United States v. Zehm*, 217 F.3d 506, 514 (7th Cir. 2000). But in determining what is and isn't reliable, the sentencing judge has considerable discretion to "conduct an inquiry broad in scope, largely unlimited either as to the kind of information [the judge] may consider, or the source from which it may come." *Pepper v. United States*, 562 U.S. 476, 489 (2011) (quoting *United States v. Tucker*, 404 U.S. 443, 446 (1972)).

Judge Griesbach held not one but two sentencing hearings to provide both sides with the opportunity to present evidence on the question of Adams's involvement in the seven shootings identified in the government's sentencing memorandum. The government's supplemental memoran-

dum provided more detail about the evidence tying Adams to the crimes. Together the two submissions summarized—and in some cases, quoted—information contained in police reports. Some of these reports recounted statements by victims, witnesses, confidential informants, and Adams himself. Although the prosecutor did not submit copies of the underlying police reports to the court, the government had earlier provided them to Adams in discovery. Notably, Adams did not and does not argue that the government misquoted, exaggerated, or otherwise misrepresented the contents of the police reports.

The government also presented Detective Klinkhammer's testimony about the reliability of at least some of the confidential informants, and Adams took the opportunity to cross-examine the detective. Finally, the judge gave Adams the opportunity to supplement the record and call witnesses as he wished. He did neither.

In evaluating the reliability and weight of this evidence, Judge Griesbach specifically acknowledged the shortcomings of the government's submission, commenting in particular about the risk of placing too much stock in statements from confidential informants and jailhouse snitches. Indeed, the judge clarified that he didn't put much weight on the information provided by the confidential informants and appears to have concluded that the government's presentation had at best only very limited evidentiary value; he ultimately declined to make any factual findings that Adams was implicated in any of the seven shootings. Instead, the judge considered the government's presentation at a very high level of generality, concluding only that Adams "is well involved in the violent gang culture, including the use of

firearms, and the threatening of people, and using firearms against people."

That assessment is fully supported by the PSR and the recounting of Adams's *own* statements as recorded in the police reports. Adams acknowledged to the PSR writer that he has been associated with the Vice Lords gang for as long as he can remember and still considers himself a member of the gang. The PSR writer also detailed multiple accounts in which Adams possessed or used a weapon to threaten others. Moreover, as we've already noted, Adams has a long criminal record that includes juvenile and adult convictions for weapons offenses and at least one violent crime.

Adams attacks the reliability of the confidential informants, but he does not take issue with any of his own statements bragging about his role in the gang and his use of firearms. And of course he cannot erase his criminal history. On this record we find nothing improper in the judge's cautious and limited consideration of the evidence of the prior shootings.

In the end, the 87-month within-guidelines sentence is presumed to be reasonable, and Adams has provided no good reason to overcome the presumption. And because Adams had the police reports well in advance and was given ample time to develop a response, his complaint that he had an insufficient opportunity to rebut the government's presentation is meritless.

AFFIRMED.